IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 6, 2014

## STATE OF TENNESSEE v. ROMILUS CARAWAY

**Appeal from the Criminal Court for Shelby County**
**No. 11-05881      James C. Beasley, Jr., Judge**

---

**No. W2013-00438-CCA-R3-CD - Filed June 30, 2014**

---

The defendant, Romilus Caraway,[1] appeals his Shelby County Criminal Court jury convictions of aggravated robbery and aggravated kidnapping, claiming that the trial court erred by denying his motions to exclude certain evidence at trial and by permitting the jury to deliberate a second day. In addition, the defendant claims that the evidence is insufficient to support his convictions. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Phyllis Aluko (on appeal) and James Hale (at trial), Assistant District Public Defenders, for the appellant, Romilus Caraway.

Robert E. Cooper, Jr., Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Shelby County grand jury charged the defendant with one count of aggravated robbery and two alternative counts of aggravated kidnapping of the victim, Terrance McDonald. The trial court conducted a jury trial beginning on October 8, 2012.

---

[1]The defendant's first name appears as "Ramilus" in various documents contained in the record, although nothing indicates that the indictment, which says "Romilus," was amended. As is the policy of this court, we utilize the spelling contained in the indictment.

Officer Tyont Shabazz with the Memphis Police Department ("MPD") testified that, on July 5, 2010, he was dispatched to 1752 Eldridge Street. Upon arrival, Officer Shabazz observed a black male lying on the porch of the house, and the male was unconscious and bleeding from a head wound. Officer Shabazz called for an ambulance and spoke with someone else at the residence. As a result of that conversation, Officer Shabazz proceeded to another nearby residential area to look for a crime scene, but he was unable to locate the described crime scene.

On cross-examination, Officer Shabazz conceded that when he attempted to locate the crime scene near Evergreen Street he was unable to find any blood or other evidence, and he could not find any witnesses.

Terrance McDonald testified that he was 33 years of age and that his nickname was "T-Mac." Mr. McDonald stated that he worked as a mechanic and that he had four children. Mr. McDonald testified that he had been present in court on the preceding day and that, while he was in a restroom just outside of the courtroom, he received two threatening telephone calls on his cellular telephone. The caller told Mr. McDonald that his grandmother was "in the front room watching television." The caller also told Mr. McDonald to "leave well enough alone[,] let it be, don't come to court." Concerned for his own safety as well as that of his grandmother, Mr. McDonald left the courthouse to check on his 83-year-old grandmother. Mr. McDonald explained that he was dressed in yellow institutional garb because he was in the protective custody of the MPD.

Mr. McDonald testified that he had known the defendant for approximately 20 years, explaining that their families had grown up in the same neighborhood, but Mr. McDonald did not characterize the defendant as his friend. Mr. McDonald described his relationship with the defendant as "a bully type relationship," explaining that the defendant had demanded money from Mr. McDonald on numerous occasions since 1993 or 1994. Mr. McDonald testified that he was sometimes able to run from the defendant and hide, but on other occasions, the defendant would produce a handgun to force Mr. McDonald to give him money.

Mr. McDonald testified that on the evening of July 5, 2010, he was enjoying a belated Independence Day celebration with friends at an apartment at Evergreen and Hunter Streets. Mr. McDonald acknowledged that he consumed "like a six-pack" of beer at the party. While at the party, the defendant asked Mr. McDonald for $30 to $40 "so his girl can pay her bill, a light bill or something." Mr. McDonald told the defendant that he did not have any money to give him, which resulted in an argument between the two men. The defendant told Mr. McDonald to leave, but Mr. McDonald refused to do so, explaining that he was enjoying himself at the party and that he was tired of following the defendant's orders.

When Mr. McDonald eventually decided to leave the party, the defendant approached him in the yard of the apartment complex and struck him in the back of the head with a tree limb that was roughly the length of a baseball bat. The blow caused Mr. McDonald to fall to the ground and land on his back. The defendant continued to swing the limb at Mr. McDonald, striking him eight or nine times. Mr. McDonald, bleeding profusely, begged the defendant to stop the attack. At some point during the attack, Mr. McDonald felt the defendant's reaching into Mr. McDonald's pockets, and he later discovered that the defendant had stolen $140 in cash, Mr. McDonald's wallet containing his identification, his Social Security card and other papers, and the keys to Mr. McDonald's house and truck.

A third party eventually urged the defendant to stop the attack, which provided Mr. McDonald with an opportunity to stand up and attempt to return to his own residence, which was one street away. When Mr. McDonald was approximately halfway to his house, he noticed his 2006 Z71 Tahoe truck pull up nearby. Thinking that someone had arrived to drive him to the hospital and blinded by the blood in his eyes, Mr. McDonald climbed into the passenger side of his truck, only to discover that the defendant was driving. The defendant told Mr. McDonald that he "shouldn't have disrespected" the defendant. Mr. McDonald attempted to get out of the truck, but the defendant walked around to the passenger side and forced Mr. McDonald into the back of the truck. The defendant then drove Mr. McDonald back to the Evergreen apartments and continued beating him with the limb, telling Mr. McDonald, "[Y]ou not fixing to go to the house and call the damn police on me."

Mr. McDonald estimated that the defendant struck him three to four more times with the limb, leading Mr. McDonald to believe that he was going to die. Mr. McDonald said that a third party must have interceded once again because the attack stopped, and Mr. McDonald was able to stumble back to his residence. On the way, he passed the residence of his next-door neighbor, John Canseler, who spotted him and pulled him to the front porch where Mr. McDonald collapsed. Mr. Canseler called 9-1-1, and Mr. McDonald was soon rushed to the hospital.

At the hospital, Mr. McDonald received multiple stitches in both the front and back of his head. Mr. McDonald testified that he could no longer see out of his right eye due to a blow to the side of his head and that he was scheduled to undergo corrective surgery in the near future.

Mr. McDonald's former girlfriend retrieved his truck from the parking lot of a store near the apartment complex where the assault occurred; she found the truck with the door open and the engine running. Aside from his car keys, Mr. McDonald did not receive any of the other items the defendant stole from him.

Mr. McDonald identified for the jury the photographic lineup, dated July 17, 2010, from which he selected the defendant's photograph as the man who had assaulted him.

Mr. McDonald admitted that, since the July 2010 assault, he had twice been convicted of misdemeanor theft, and he explained that, while incarcerated for one of those thefts, he encountered the defendant in jail. The defendant told Mr. McDonald that he had been looking for him and "trying to find ways to destroy" him, thinking of "many kind[s] of ways to get back at" him. The defendant complained that Mr. McDonald "shouldn't have disrespected him that night" and "should have went on and ran on to the house," stating that Mr. McDonald "was irritating him and that's why [the defendant] did what he did to" Mr. McDonald.

On cross-examination, Mr. McDonald admitted that he was intoxicated on July 5, 2010, but he did not recall whether he was holding a beer bottle in his hand during his initial argument with the defendant that night. Mr. McDonald conceded that, during the verbal exchange with the defendant that evening, Mr. McDonald threatened to kill the defendant if he attempted to rob him again, which resulted in the defendant's beating Mr. McDonald with the tree limb. Mr. McDonald denied attempting to hit the defendant with a beer bottle during their altercation.

On redirect examination, Mr. McDonald testified that he had received multiple telephone calls from the defendant, some originating from the jail and some originating from unknown cellular telephone numbers. Mr. McDonald explained that people would sometimes smuggle cellular telephones into the jail to provide the inmates with ways of initiating unmonitored telephone calls. When asked if he had received calls from the jail on Sunday, October 7, Mr. McDonald responded, "All day Sunday," but he testified that he did not answer any of the calls because he was able to discern that they had originated from the jail.

MPD Officer David Cunningham testified that, on July 5, 2010, he was dispatched to St. Francis Hospital to interview Mr. McDonald. When Officer Cunningham encountered Mr. McDonald, he noticed that Mr. McDonald was covered in blood with "a big whelp on his head and some . . . whelps on his hands to[o]." Officer Cunningham photographed the defendant and his injuries, and he identified for the jury those photographs. Officer Cunningham spoke with Mr. McDonald about his injuries and what had transpired, but he did not take a formal statement from him that night. Officer Cunningham recalled that Mr. McDonald told him that he and two friends were parked at Gino's on Evergreen when the defendant approached them with a wooden baseball bat. Mr. McDonald said that he and his friends ran but that the defendant gave chase, striking Mr. McDonald on the leg with the bat. Mr. McDonald ran to the grassy area of the apartment complex across the street when

the defendant struck him on the head with the bat, causing Mr. McDonald to fall to the ground. Mr. McDonald told Officer Cunningham that he begged for his life. Officer Cunningham clearly recalled that Mr. McDonald told him that the defendant replied, "[Y]ou bitches going to have to give it up, I ain't got nothing to lose." At that point, Mr. McDonald recalled that the defendant stole his wallet and other items before striking him again, at which point Mr. McDonald lost consciousness.

Johnathan Canseler testified that his nickname was John or "John-John" and that he had grown up with Mr. McDonald. Mr. Canseler also testified that he knew the defendant and that his nickname was "May-May." On July 5, 2010, Mr. Canseler was visiting his sister on Eldridge Street when he saw Mr. McDonald's truck "make a U-turn in the middle of Evergreen Street" and head in the direction of Gino's. Mr. Canseler noticed that the defendant was driving Mr. McDonald's truck, but Mr. Canseler did not see Mr. McDonald in the vehicle. A short time later, Mr. Canseler saw Mr. McDonald stumbling in his direction. Mr. Canseler approached and asked what had happened, and Mr. McDonald replied that "May-May had beat him with a stick." Mr. Canseler then called 9-1-1. While waiting for the paramedics to arrive, Mr. McDonald "started patting his pocket trying to see what he actually had in his pocket, which was nothing."

On cross-examination, Mr. Canseler insisted that, even in the dark from a quarter mile away, he was able to discern that the defendant was driving Mr. McDonald's vehicle.

On redirect examination, Mr. Canseler testified that he had known the defendant for over 20 years and that the truck's windows were down when he spotted the defendant driving Mr. McDonald's truck.

Juaquatta Harris, a Corrections Deputy with the Shelby County Sheriff's Office, testified that she monitored inmate telephone calls. Officer Harris stated that all telephone calls made from the jail by inmates are recorded, and she explained that, when an inmate makes a call, a "prompt" alerts them that their calls are "subject to monitoring and recording." Officer Harris testified that, between August 4, 2012 and October 8, 2012, the defendant, identified through his unique Record and Identification number, attempted 59 telephone calls to one particular telephone number.

Through the testimony of Officer Harris, the State introduced into evidence a compact disc which contained recordings of two telephone calls placed by the defendant to a third party on Monday, October 8, and these recordings were played for the jury. The first call was placed at 4:04 p.m., and the second call was placed at 4:14 p.m. Although much of the two brief conversations is unintelligible, it is clear that, in the first conversation, the

defendant instructs the third party to call "Little Brian" and inform Little Brian that the third party is calling at the behest of May-May. The defendant then specifically mentions "T-Mac" and "John-John" and states that Little Brian needs to "get on top of that" and that Little Brian "already knows what I'm talking about." The defendant instructs the third party to place the call to Little Brian "immediately." In the second conversation, which took place only minutes after the first, the defendant immediately inquires as to whether the third party had called Little Brian. Following the third party's response, the defendant raises his voice and sounds angry, stating that there should be "no beating around the bush." The defendant then mentions John-John and T-Mac a second time and expresses concern that the two were "showing up."

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, the defendant chose not to testify or offer any proof.

Based on this evidence, the jury convicted the defendant as charged of aggravated robbery, aggravated kidnapping with intent to terrorize, and aggravated kidnapping resulting in bodily injury. Following a sentencing hearing, the trial court merged the two kidnapping convictions and sentenced the defendant as a persistent offender to a term of 30 years to be served at 85 percent for the aggravated robbery conviction and to a term of 30 years to be served at 100 percent for the aggravated kidnapping conviction. The trial court further ordered the two sentences to be served concurrently to one another but consecutively to the defendant's 250-month federal sentence in a separate case.

Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by denying his motions to exclude evidence of his prior robberies of Mr. McDonald, evidence of threatening telephone calls received by Mr. McDonald, evidence of telephone calls placed by the defendant from jail, and the admission of third party statements contained in recorded telephone conversations. In addition, the defendant contends that the evidence adduced at trial was insufficient to support his convictions and that the trial court erred by requiring the jury to deliberate for a second day. We consider each claim in turn.

*I. Evidentiary Issues*

*A. Prior Robberies*

The defendant first contends that the trial court erred by denying his motion to exclude evidence of the prior occasions on which the defendant had robbed Mr. McDonald. The defendant claims that the proof of the prior robberies was not clear and convincing and

-6-

that the probative value of such testimony was outweighed by the danger of unfair prejudice.

Prior to trial, the defendant moved to exclude evidence that he had allegedly robbed Mr. McDonald in the past. The trial court conducted a hearing at which Mr. McDonald testified that he had known the defendant for approximately 20 years and that the defendant had, on occasions too numerous to count, demanded money from him. Mr. McDonald testified that he always complied because he did not want the defendant to rob him, explaining that, on five to eight previous occasions since 1995, the defendant had robbed him, twice while armed with a handgun. When, on July 5, 2010, the defendant asked Mr. McDonald for money and Mr. McDonald responded that he did not have any money to give, an argument ensued because it was the first time that Mr. McDonald had refused the defendant's request. On cross-examination, Mr. McDonald confirmed that the defendant had pointed a gun at him when robbing him on prior occasions, but Mr. McDonald acknowledged that he had never reported those incidents to law enforcement officers.

The trial court denied the defendant's motion, finding "clear and convincing evidence of prior occasions in which [the defendant] has asked [Mr. McDonald] for and/or forcefully removed money from him in the past." The trial court found Mr. McDonald's testimony to be both relevant and probative as to the defendant's intent. In addition, the trial court found that the testimony "goes to rebut any allegation that Mr. McDonald was the chief aggressor in this incident" and that "it gives a full contextual background so the jury can understand the full facts and circumstances of the case." The trial court cautioned that it would "admonish the jury that we're only talking about one particular incident and that these other issues are offered simply for those purposes." The trial court concluded that "the probative value outweighs any prejudicial effect it would have on the defendant" based on the defendant's theory that Mr. McDonald was the first aggressor. Following the testimony of the States's final witness, the trial court issued the following special jury instruction:

> Ladies and gentlemen, let me just admonish you this. If from the proof you find that the defendant has committed a crime or other crimes other than that for which he is on trial, you may not consider such evidence to prove his disposition to commit such a crime as that on trial. This evidence may only be considered by you for the limited purpose of determining whether it provides the complete story of the crime, that is such evidence may be considered by you where the prior crimes and the present alleged crime are logically related or connected or are a part of the same transaction so that proof of the other tends or is necessary to prove the one charged or is necessary for a complete account thereof or that the defendant's intent, that is

such evidence may be considered by you if it tends to establish that the defendant actually intended to commit the crime with which he is presently charged. Such evidence of other crimes if considered by you for any purpose must not by considered for any purpose other than that specifically stated.

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury's convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than upon the strength of the evidence. *State v. Thacker*, 164 S.W.3d 208, 239 (Tenn. 2005).

Notwithstanding the general rule, evidence of a defendant's prior crimes, wrongs, or acts may be admissible where it is probative of material issues other than conduct conforming with a character trait. Tenn. R. Evid. 404(b). Thus, evidence of a defendant's character may become admissible when it logically tends to prove material issues which fall into one of three categories: (1) the use of "motive and common scheme or plan" to establish identity; (2) to establish the defendant's intent in committing the offense at trial; and (3) to "rebut a claim of mistake or accident if asserted as a defense." *Thacker*, 164 S.W.3d at 239 (citing *State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996)). To admit such evidence, the rule specifies three prerequisites:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admission is that the court must find by clear and convincing evidence that the defendant committed the other crime. *Id.*, Advisory Comm'n Comments; *State v. DuBose*, 953 S.W.2d 649, 654 (Tenn. 1997); *State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985).

In reviewing a trial court's decision to admit or exclude evidence under Rule

404, an appellate court may disturb the trial court's ruling only if there has been an abuse of discretion. *Thacker*, 164 S.W.3d at 240. The trial court's determination is entitled to deference when it has substantially complied with the procedural requisites of Rule 404(b). *See DuBose*, 953 S.W.2d at 652. If, however, the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *See id.*

In the instant case, the trial court conducted a pretrial hearing and determined that the State established the prior robberies by clear and convincing evidence, that the evidence of the prior robberies was material to the defendant's intent to rob Mr. McDonald on July 5, 2010, and that the probative value of the testimony regarding the prior robberies was not outweighed by the danger of unfair prejudice. Because the trial court painstakingly complied with the requirements of Rule 404(b), this court will review the trial court's determination for an abuse of discretion. Under this standard of review, this court will only reverse the trial court's ruling if the lower court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004).

The State introduced evidence of the prior robberies the defendant committed against Mr. McDonald to show intent, and the trial court properly instructed the jury that such evidence could be considered for the limited purposes of determining whether it tended to show intent and a complete picture of the crime. We cannot conclude that the trial court abused its discretion by determining that the probative value of the evidence outweighed its prejudicial impact. Accordingly, the admission of evidence of the prior robberies was not error.

### B. Threatening Telephone Calls

The defendant next contends that the trial court erred by permitting Mr. McDonald to testify about threatening telephone calls he received on the afternoon of October 9, 2012. Specifically, the defendant argues that testimony regarding the nature of the telephone calls should have been excluded under Tennessee Rule of Evidence 404(b); that the evidence was irrelevant; and that Mr. McDonald's testimony about statements made to him during the telephone calls was inadmissible hearsay. We disagree.

When the trial court instructed the State to call its first witness, the prosecutor requested a bench conference, explaining that Mr. McDonald, who was set to testify first, was not present. The State called Officer Shabazz out of order, and, following the officer's testimony, the trial court granted a short recess. Because the State was unable to locate Mr. McDonald, the trial court agreed to continue the trial until the following day and granted the

State's request to issue a material witness warrant for Mr. McDonald.

When the trial resumed on October 10, the prosecutor informed the trial court that MPD officers had found Mr. McDonald and explained that Mr. McDonald had fled the previous day because he had received threatening telephone calls. The defendant objected to any testimony related to Mr. McDonald's flight, arguing that its prejudicial effect would outweigh any probative value. The defendant also argued that, if Mr. McDonald testified to the substance of the threats, such statements would be inadmissible hearsay. The trial court denied the defendant's oral motions and permitted Mr. McDonald to testify about the threats.

Mr. McDonald then testified that he had received two telephone calls on the previous afternoon that caused him to be scared for his own safety and that of his 83-year-old grandmother. The caller told Mr. McDonald that "your grandmother, she's in the front room watching television," and the caller told Mr. McDonald to "leave well enough alone[,] let it be, don't come to court." Mr. McDonald also explained that he was wearing yellow prison garb because he was in protective custody.

With respect to the defendant's argument that Mr. McDonald's testimony concerning his flight and the threatening telephone calls should have been excluded under Rule 404(b), such argument has been waived for failure to object on the basis of Rule 404(b) at trial. *See State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived.").

The defendant did, however, argue that evidence of the threatening telephone calls was irrelevant and unfairly prejudicial. Questions concerning the admissibility of evidence under Tennessee Rule of Evidence 403 rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See DuBose*, 953 S.W.2d at 652; *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of

undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.  The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978).

We see no abuse of discretion in the trial court's decision to allow the testimony of Mr. McDonald concerning the threatening telephone calls and his subsequent flight.  Although Mr. McDonald did not testify that the defendant made the threatening calls, Officer Harris later testified about the two telephone calls the defendant made from jail on October 8, and the jury heard the recordings of those calls in which the defendant referenced Mr. McDonald and Mr. Canseler and urged the third party he was speaking with to "get on top of that."  The fact that Mr. McDonald received telephone calls urging him not to come to court and indicating that Mr. McDonald's grandmother was being watched, only one day after the defendant placed calls to a third party referencing Mr. McDonald, is certainly relevant as it made it more probable that the defendant committed the crimes with which he was charged.  *See* Tenn. R. Evid. 401.  Furthermore, the testimony was probative of the defendant's guilt, and we cannot say that the probative value of the testimony was outweighed by the danger of unfair prejudice.  *See* Tenn. R. Evid. 403.

Finally, the defendant's argument that the substance of the threatening telephone calls should have been excluded as inadmissible hearsay must fail because the statements made to Mr. McDonald were not, in fact, hearsay.  "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted*." Tenn. R. Evid. 801(c) (emphasis added).  The statements made to Mr. McDonald were not offered to prove their truth; rather, the statements were offered to show their effect on Mr. McDonald.

The defendant is not entitled to relief on this issue.

### C.  Telephone Calls from Jail

Next, the defendant argues that the trial court erred by admitting evidence of 59 telephone calls placed by the defendant while incarcerated.  The defendant contends that the evidence was irrelevant and unfairly prejudicial.  The State counters that the defendant has waived this issue for failure to raise it at trial.  We agree with the State.

When the prosecutor indicated to the trial court her intention to question Officer Harris about the multiple telephone calls from the defendant to the victim's cellular telephone number, the defendant made no objection.  In his cross-examination of Mr. McDonald, the defense attorney inquired of Mr. McDonald whether he had received

telephone calls from the defendant, and Mr. McDonald stated that he had. When Officer Harris testified, she stated that the defendant had made 59 calls to a specific telephone number between August 4, 2012 and October 8, 2012. The defendant neither objected to this testimony nor conducted any cross-examination of Officer Harris.

Because he failed to lodge a contemporaneous objection, the defendant has waived our consideration of the propriety of the admission of Officer Harris's testimony. *See* Tenn. R. Evid. 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of the record stating the specific ground of objection if the specific ground is not apparent from the context[.]"); Tenn. R. App. P. 36(b) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12 (Tenn. Crim. App. 1987). Clearly, the defendant had ample opportunity to object, and he did not. Thus, our consideration of this issue has been waived.

### D. Admission of Third Party Statements

The defendant next contends that the trial court erred by admitting the third-party statements that were included in the recorded jailhouse telephone conversations with the defendant. The defendant argues that the statements of this third party are inadmissible hearsay subject to no exception. The State avers that the third-party statements are not hearsay and were therefore properly admitted. We agree with the State.

As previously addressed, the defendant, in his telephone calls to an unidentified third party on October 8, instructs the third party to call "Little Brian" on his behalf. The defendant references "T-Mac" and "John-John" and states that Little Brian needs to "get on top of that" and that Little Brian "already knows what I'm talking about," instructing the third party to place the call to Little Brian "immediately." In the second conversation, the defendant immediately demands to know whether the third party had called Little Brian, and the defendant then angrily declares that there should be "no beating around the bush." The defendant then mentions John-John and T-Mac a second time and expresses concern that the two were "showing up."

On appeal, the defendant does not contest the admissibility of the defendant's statements, and such statements were clearly admissible as admissions of a party opponent.

*See* Tenn. R. Evid. 803(1.2)(A). With respect to the statements of the third party, such statements were not offered for their truth and were therefore not hearsay. *See* Tenn. R. Evid. 801(c). Because the trial court did not abuse its discretion by admitting these audio recordings, the defendant is not entitled to relief on this issue.

## *II. Sufficiency*

The defendant contends that the evidence is insufficient to support his convictions of aggravated robbery and aggravated kidnapping. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, aggravated robbery is "robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103.

"Aggravated kidnapping is false imprisonment, as defined in § 39-13-302, committed . . . [w]ith the intent to inflict serious bodily injury on to or to terrorize the victim" or "[w]here the victim suffers bodily injury." T.C.A. § 39-13-304(a)(3), (4). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a).

Here, the proof adduced at trial established that the defendant attacked Mr. McDonald, who was unarmed, because Mr. McDonald refused to give the defendant any money. The defendant struck Mr. McDonald eight or nine times with a tree limb that was roughly the size of a baseball bat, causing profuse bleeding. During the attack, Mr. McDonald felt the defendant reach into Mr. McDonald's pockets, and it was only later that Mr. McDonald discovered that the defendant had stolen $140 in cash, his wallet, and the keys to his house and truck.

Mr. McDonald ran from the defendant and was close to his own residence, which was one street away, when the defendant arrived in Mr. McDonald's truck. Mr. Canseler, who was visiting his sister on Eldridge Street, witnessed the defendant driving Mr. McDonald's truck and saw the defendant make a U-turn on Evergreen. The defendant forced Mr. McDonald, who was bleeding heavily, into the truck and continued beating Mr. McDonald with the limb, telling him, "[Y]ou not fixing to go to the house and call the damn police on me." The defendant struck Mr. McDonald three to four more times, and Mr. McDonald believed that the defendant was going to kill him. Eventually, Mr. McDonald was able to escape. A few minutes after spotting the defendant driving Mr. McDonald's truck, Mr. Canseler saw Mr. McDonald stumble toward his house on Eldridge. When Officer Shabazz first encountered Mr. McDonald, the victim was unconscious and bleeding from a head wound. Once at the hospital, Mr. McDonald received multiple stitches in both the front and back of his head, and he discovered that he could no longer see out of his right eye. Mr. McDonald positively identified the defendant as the man who had attacked him, and he testified that he had known the defendant for approximately 20 years.

Affording the State the strongest legitimate view of the evidence and deferring to the credibility determinations made by the jury, we conclude that the evidence strongly supports the defendant's convictions of aggravated robbery and aggravated kidnapping.

*III. Jury Deliberations*

Finally, the defendant argues that the trial court erred by requiring the jury to deliberate a second day when the jury had indicated that it was deadlocked on the aggravated kidnapping counts, asserting that the trial court's actions "improperly overbore the province of the individual juror to decide the facts and how the law applies to the facts." The State responds that the defendant has waived this issue for failure to raise it before the trial court and that, in any event, the trial court's actions do not constitute plain error. Again, we agree with the State.

In the instant case, the jury began its deliberations at 10:19 a.m. on October 11. At 5:34 p.m., the jury returned to the courtroom and informed the trial court that it had

-14-

reached a verdict on count one but was deadlocked on counts two and three. The trial court polled the jurors to determine if further deliberations would be helpful in reaching a verdict, and only one juror responded in the affirmative. The trial court then conducted a bench conference and stated as follows:

> Based on the numbers, I'm not sure that they're going to reach a verdict on that with the other eleven saying no. But I think, unless you feel otherwise, I'm going to let them continue to work a little bit.

The defendant's attorney responded, "I'll leave it up to you, Judge," and the prosecutor likewise deferred to the trial court. The trial court then asked the jury to "step back and see if you can continue to talk a little bit more." Sometime later that same day, the trial court brought the jury back into the courtroom to conclude the proceedings for the day. The foreperson indicated that the jury was still unable to reach a verdict. The trial court then instructed as follows:

> I do not want anybody to feel pressured. I do not want anybody to feel that they're being forced into making a decision.
>
> I do not want anybody to in any way feel that way.
>
> And time constraints are not a problem, but by the same token I have to be sure that everybody feels the same way.
>
> And you know, I don't mind polling you again, but I do not want anybody in any form or fashion to feel that they need to vote to change their honest opinion, I mean that's – under the law, I think that's proper.
>
> And I understand the inconvenience, but I just – I want to make sure that everybody understands that. I don't mind polling you again, if you want me to do that, but you know, I do not want anybody to feel that they have to change their honest opinion, that would be the wrong thing to do.
>
> If you feel that you're in the same position that you were in, I understand that. But if there's any chance at all that there's a possibility the jury can reach a verdict, then obviously, that's what I would like to do.

The trial court then began polling the jurors a second time, asking if they felt as though continued deliberations could possibly lead to a change in the vote. The third juror polled stated that she was "kind of on the fence. I feel like if we had a breather." The trial court then stated:

> Okay. Well, I'm going to do this, ladies and gentlemen, and I hope you understand what I'm saying. And I understand that it's inconvenient.
>
> But I feel like if I stop just based on some of your answers and some of the things you're saying that I'm forcing somebody to do something they don't want to do and I don't think that's right.
>
> So I would rather to have you come back in the morning, sleep on it, you get back in here in the morning and you talk about it and then we go from there. Okay?
>
> And again, understand what I'm saying, and I mean this with all sincerity.
>
> The law says that we want you to deliberate with a view to reaching an agreement if you can do so without violence to each of you's [sic] individual judgment.
>
> And so, what that means is I need everybody to be comfortable with your feelings.
>
> And if you're not comfortable, then we can keep working. I'm going to be here tomorrow and we're going to be in here plugging away, and so, I would feel much more comfortable in light of what I'm seeing and what I'm hearing, if you come back in the morning, and sleep on it tonight, and then we can talk again tomorrow, but I'm going to ask if you will do that at this point.

The trial court then adjourned court until 9:00 a.m. on October 12. At 2:38 p.m. on October 12, the jury returned and delivered verdicts of guilty on all three counts. The defendant did not raise the issue of jury deliberations in his motion for new trial.

-16-

Because the defendant did not object to the trial court's decision to allow the jurors to continue deliberations and because the defendant failed to raise the issue, at any point before the trial court, he has waived our consideration of this issue. *See Johnson*, 970 S.W.2d at 508; *see also* Tenn. R. App. P. 36(b); *Killebrew*, 760 S.W.2d at 235; *Jenkins*, 733 S.W.3d at 532; *Rhoden*, 739 S.W.2d at 11; *see also* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . [any] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise, such issues will be treated as waived.").

Moreover, the actions of the trial court do not rise to the level of plain error. Before an error may be recognized as plain, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). Authority to correct an otherwise "forfeited error" lies strictly "within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Olano*, 507 U.S. 725, 732 (1993) (citations omitted).

In *State v. Smith*, our supreme court adopted *Adkisson*'s five-factor test for determining whether an error should be recognized as plain:

> "(a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;
>
> (d) the accused did not waive the issue for tactical reasons; and
>
> (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283.

In the instant case, the trial court clearly adhered to the directives of *Kersey v. State*, in which our supreme court held that "when a jury's deliberations have not produced

-17-

a verdict, and it returns to the courtroom and so reports, . . . [t]he only permissive inquiry is as to progress and the jury may be asked whether it believes it might reach a verdict after further deliberations." *Kersey v. State*, 525 S.W.2d 139, 141 (Tenn. 1975). If the trial court "feels that further deliberations might be productive, he may give supplemental instructions in accordance with subsequent portions of this opinion." *Id.* The trial court in the instant case twice inquired of the jurors whether further deliberations would be helpful. On the first occasion, one juror responded in the affirmative, and on the second occasion, one juror responded that a "breather" might assist the jury in reaching a verdict. We certainly cannot say that the trial court's decision to allow the jury to continue deliberations for one more day adversely affected the defendant's rights, and the trial court unquestionably followed the law. Consequently, the trial court did not err by requiring the jury to continue its deliberations.

*IV. Conclusion*

In light of the foregoing analysis, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE